```
              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA
```

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 8:04CV170 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | MEMORANDUM AND ORDER |
| 46,000.00 IN UNITED STATES CURRENCY, | ) ) | |
| | ) | |
| Defendant. | ) | |

The government's civil forfeiture action was tried before me on April 27, 2007 and is now submitted for entry of final judgment.[1]  The government claims $46,000 in United States currency seized during a traffic stop in Nebraska on June 24, 2003 is traceable to the sale and distribution of controlled substances.  It therefore seeks forfeiture of this money to the United States pursuant to 21 U.S.C. § 881(a)(6).

The money seized during the traffic stop was found in a duffel bag owned by James E. Thompson ("Thompson"), a passenger in the vehicle.  Thompson claims $28,000 of this money is his personal property; Sandra Zeppa ("Zeppa"), Thompson's girlfriend, claims the remaining $18,000 belongs to her.  Filing 58.  Thompson and Zeppa claim the seized money was not used or acquired during the commission of any drug-related crimes, and therefore the money must be returned to them.[2]

---

[1]This case is pending before me for final resolution pursuant to the parties' consent. See filing 37, "Consent to Exercise of Jurisdiction by a United States Magistrate Judge and Order of Reference," and 28 U.S.C. § 636(c).

[2]The initial Answer did not include Zeppa's claim, and requested an order returning the seized currency to only Thompson.  Filing 7.  The Amended Order on Pretrial conference

SUMMARY OF TESTIMONY

On June 24, 2003, at approximately 8:21 p.m., James Bartola Eckersen, Jr. ("Eckerson") was driving a Lincoln Town Car westbound on Interstate 80 in Omaha, Nebraska. Thompson was a passenger in the vehicle.

Douglas County Deputy Sheriff Shea Degan ("Deputy Degan") was patrolling Interstate 80 that evening in a marked unit, and was accompanied by a ride-along officer, Drug Enforcement Administration Special Agent Donato Sikorski ("Agent Sikorski"). Deputy Degan is a canine officer, and has been assigned to road patrol for eight years. Agent Sikorski, a DEA Special Agent since January 2000, investigates and enforces federal narcotics violations.

As Eckerson's vehicle neared the Interstate 80 exit for 72nd Street in Omaha, Deputy Degan and Agent Sikorski saw the vehicle straddling the center line as it traveled, and observed it following another vehicle too closely. Deputy Degan initiated a traffic stop of the Town Car near the Interstate 80 exit for 84th Street in Omaha, Nebraska.

Deputy Degan and Agent Sikorski exited the patrol vehicle and approached the stopped Town Car. Deputy Degan went the the

---

identifies both Zeppa and Thompson as claimants, but states Thompson has filed a claim for ownership of the seized funds. Filing 47, p. 1 & p. 2, ¶ 5. The Amended Answer filed on the day of trial continues to pray for an order returning the entire $46,000 to James E. Thompson. Filing 58. Both Thompson and Zeppa testified that $18,000 of this money is owned by Zeppa and not Thompson. Accordingly, the court assumes that despite the failure to amend the prayer for relief in the Amended Answer, Thompson and Zeppa are requesting return of the seized funds in accordance with their testimony.

driver's side window to contact the driver; Agent Sikorski approached the passenger side window.  At Deputy Degan's request, Eckerson exited the vehicle and stood on the grass near the rear passenger side corner of the Town Car north of Interstate 80's westbound lanes.  When Deputy Degan explained that he had stopped the vehicle for crossing the center line and following too close, Eckerson chuckled and commented that he believed he was being stopped for speeding and was trying to slow down after seeing the officer's marked patrol vehicle.

Deputy Degan questioned Eckerson about the origin, destination, and itinerary of his trip.  Eckerson's response indicated there was no set itinerary.  Eckerson stated he was a laid off truck driver.  He stated he and Thompson were traveling from Traverse City, Michigan, and that they planned to possibly stop overnight in Lincoln before traveling to Las Vegas to gamble for about three days.  Eckerson did not mention staying with a relative in Lincoln.

When asked if there were any narcotics in the vehicle, Eckerson responded, "No."  When asked if there were large amounts of currency in the vehicle, Eckerson responded, "Not to my knowledge."  Eckerson's equivocal response when questioned about currency seemed suspicious to Deputy Degan because, in his experience, this type of response is typically given by those who are transporting substantial amounts of cash derived from illegal conduct.

While Deputy Degan spoke with Eckerson on the roadside, Agent Sikorski spoke with Thompson.  In response to Agent Sikorski's questions, Thompson stated he and Eckerson were traveling from Michigan and were heading "out west," to

California and possibly Las Vegas.  Thompson stated he and Eckerson had no motel reservations for the trip.  Agent Sikorski noted that Thompson appeared tired, and asked if he and Eckerson planned to stay somewhere overnight.  Thompson stated they were possibly stopping en route in Lincoln, Nebraska to stay with his niece, Linda.  Thompson could not provide Linda's last name or the location of her home.

When Deputy Degan had finished questioning Eckerson, he walked toward the vehicle's passenger side front window to speak with Thompson.  As he passed Agent Sikorski along the roadside, Deputy Degan briefly explained what Eckerson had said.  Agent Sikorski responded that Thompson's story was different.

Deputy Degan approached Thompson and questioned him about the trip itinerary.  Thompson responded that Eckerson was on vacation from his employment, and that he and Eckerson were heading to Lincoln, Nebraska to visit Thompson's niece for a few days.  He stated they were then traveling on to the western United States; to southern California, or maybe even Las Vegas.  Thompson stated the trip would last between seven and ten days, but there was no set itinerary.  Deputy Degan considered the lack of any itinerary for such a long trip unusual, noting that while some people take a lackadaisical approach to travel, those involved in the trip are usually all "on the same page."

Deputy Degan also noted that while most people are nervous when speaking to an officer, Thompson appeared more nervous than normal.  When asked if there were illegal narcotics in the vehicle, Thompson maintained eye contact and said, "No."  However, when Deputy Degan asked if there were large amounts of currency in the vehicle, Thompson did not maintain eye contact.

4

Thompson denied having large amounts of currency, and as he did so, he looked down and away, and his left eye began to twitch. Since this was such an unusual reaction, Deputy Degan repeated the question. Thompson again looked down, his left eye began to twitch, and he denied having large amounts of currency. Deputy Degan explained that he was looking for vehicles transporting drugs or large amounts of currency indicative of drug trafficking. He asked Thompson to be honest with him. Thompson responded that there may be $3000 or $4000 in the car.

While Deputy Degan and Agent Sikorski were questioning Eckerson and Thompson, Sergeant Edward VanBuren ("Sergeant VanBuren"), Deputy Murphy, and Deputy Fitzsimmons of the Douglas County Sheriff's Department arrived at the scene. Sergeant VanBuren has been a canine officer since 1993, a canine officer instructor since 1999, and a supervisor since 2001. Upon arriving at the scene or the traffic stop, Sergeant VanBuren conducted a criminal history check. Sergeant VanBuren was told there was an outstanding warrant for Eckerson's arrest. He advised Deputy Degan of the arrest warrant. Eckerson was placed in custody and advised of his <u>Miranda</u> rights. Eckerson asked that his vehicle and its contents be released to Thompson.

Since the vehicle was being released to Thompson, Deputy Degan asked Thompson and Eckerson if the officers could search the vehicle. Both Thompson and Eckerson consented to a vehicle search. Thompson also specifically consented to a search of his duffel bag located on the back seat of the car.

Sergeant VanBuren deployed his canine, Mato, to perform a canine sniff of the vehicle. Mato, a certified narcotics dog, was trained by Sergeant VanBuren in 2002, and has thereafter been

5

certified annually and trained weekly for narcotics detection. Mato was trained to exhibit behavior changes as an "alert" that the scent of illegal drugs is present, and scratches, barks, or bites to "indicate" the focal point of that scent. Although some canines need to be trained not to respond to the scent of currency, Mato did not need this training. Mato has never alerted or indicated to the scent of currency alone. Mato is a diligent, "high hunt drive," highly focused, and very reliable narcotics canine. He has never refused to obey the command to perform a canine sniff, and has never quit before completing that function. Mato has never been considered "unfit" and therefore in need of further remedial training or retirement.

Mato sniffed the Lincoln Town Car, and as he passed the driver's door seam, indicated the scent of narcotics by scratching at the driver's side door seam. Deputy Degan advised Thompson of the positive canine sniff. Thompson stated there may be $30,000 to $40,000 in the duffel bag, but provided no exact figure.

Deputy Degan removed the duffel bag from the vehicle, and searched it. Along with Thompson's clothing and toiletries, he found 19 bundles of cash. See exs. 2 & 3. The bundles were rubber banded and placed in a bag or sack within the duffel bag. Throughout his years of experience as a patrol officer, every time Deputy Degan found substantial amounts of rubber banded cash in a vehicle, he also discovered that the vehicle occupants were engaged in illegal activity. Large amounts of rubber banded currency is frequently associated with illegal drug activity. However, in this case, there was no other evidence of illegal activity found during the search of the Lincoln Town Car.

Eckerson and Thompson were transported to the Douglas County Sheriff's Office to be interviewed. Agent Sikorski interviewed them separately. At the outset of both interviews, Agent Sikorski explained that the $46,000 in cash found in the vehicle piqued the officers' interest because carrying large sums of cash typically indicates illegal drug activity. Eckerson responded that he had no knowledge of the money found in the duffel bag. Eckerson signed a disclaimer form confirming that he claims no interest in the $46,000 found in the vehicle. Ex. 1. During Thompson's interview, Thompson, who had initially denied having large amounts of money, now stated he could account for $25,000 to $30,000 of the cash, and that he owned the money. Thompson did not mention Zeppa's alleged ownership of any of the cash. Thompson explained that he was carrying cash because he does not trust banks. He stated the cash was derived from his car repair and sales business which he conducts on a cash basis.

Sergeant VanBuren conducted a discretionary search with Mato at the locker room of the Douglas County Sheriff's Office. Three hundred one dollar bills obtained from a local bank were placed in a locker, and the 19 bundles of currency found in the Town Car were placed in another locker. After waiting one or two minutes, Mato was commanded to perform a canine sniff of the locker room. Mato indicated at the locker containing the 19 bundles of cash, but not at the locker containing the $300. The 19 bundles of cash were seized as drug money.

Thompson and Zeppa claim they own this money and that the money was acquired through legal means. Thompson, Zeppa, and Zeppa's two minor sons live in the same home. Zeppa is the custodial parent of her sons, and their father, Zeppa's ex-husband, is disabled and in jail.

Zeppa claims that in May of 2003, she received two checks from the Social Security Administration ("SSA") as back payment of child support owed by her ex-husband.  Each check was in the amount of $10,018.  She received the checks in separate mailings, the second check arriving about nine days after the first.  See exs. 101 and 102.  Zeppa claims the first check was deposited in her checking account.  She testified that she withdrew approximately $2000 from the account to pay off the loan for her sons' private schooling and to pay property taxes.  Zeppa did not produce any cancelled checks for these payments.  She claims she used a money order to pay off the loan because she was out of check blanks.  No copy of the money order was offered into evidence.  Zeppa claims that after the loan was paid off, she withdrew the remaining amounts in the checking account as cash.  No copies of checking account statements, deposit slips, or withdrawal slips were offered into evidence.  Zeppa claims she cashed the second Social Security check upon receipt.

According to Zeppa, she and Thompson share finances and operate their household on a cash-only basis because Thompson does not trust banks and wants immediate access to his money.  Zeppa testified that her money is stored in an unlocked lockbox located behind her bedroom dresser.  She testified the currency received from withdrawing funds from her checking account and cashing the second Social Security check were placed in the lockbox, and since it was unlocked, Thompson had access to those funds.  Zeppa explained that when Thompson needs money, he can remove it from her lockbox and, in accordance with their accepted household procedure, leaves a note stating how much he withdrew.

Thompson likewise testified that he hides cash on his residential property.  He explained that he repairs vehicles and

buys and sells cars, and commonly uses cash for this business. Thompson testified that when he receives cash, he bundles it in $1000 increments composed of various denominations of bills, secures the bundle with a rubber band, and keeps this bundled money in various locations on his property. Thompson testified that he has stored money in a safe located in the trunk of Zeppa's Cadillac, in a dresser drawer, in the pocket of his leather coat, under his mattress, in a toolbox on the bench in his garage, and in a hole in his back yard.

Thompson testified his portion of the money found in the duffel bag on June 24, 2003 was the remaining proceeds of a bank loan he received to start his business and his personal savings. After being released from prison for alcohol-related criminal activity, Thompson applied for a loan secured by his home. He received the loan proceeds totaling $35,811.32 on July 13, 2001. See ex. 4. According to Thompson, the loan check was deposited in his credit union, and he withdrew the money in increments as needed for his business over the following three weeks. No credit union statements or withdrawal slips reflecting these alleged transactions were offered into evidence.

Thompson claims that since he conducted his business on a cash basis, the actual bills received from the credit union with these withdrawals changed hands several times over the years, and the bills he received from the credit union were not the same bills stored in his home on June 24, 2003. However, the money was nonetheless earned by operating a legitimate and legal car repair and sales business. Thompson did not produce copies of his income tax returns or business records or receipts to substantiate this testimony.

Zeppa testified that in June of 2003, she and Thompson were planning to travel to Las Vegas to be married. However, they had an argument and, on June 24, 2003 between 7:00 a.m. and 8:00 a.m., Thompson and Eckerson left Traverse City and began traveling to Las Vegas. Thompson claims that before he left, he grabbed "as much money as [he] could put [his] hands on" for gambling, including the money in his dresser drawer, under his mattress, in the pocket of his leather coat, and the $18,000 in Zeppa's lock box. Zeppa testified that Thompson left a note stating she should not worry because he loved her and he had taken the money. This note was not offered into evidence. She later testified that she discovered the money was missing a day or a day and a half later, and she received a call from Thompson telling her not to worry because he had the money.

## LEGAL ANALYSIS

The Civil Asset Forfeiture Reform Act of 2000, 843 Pub.L. No. 106-185, 114 Stat. 202 (2000) ("CAFRA"), significantly modified civil forfeiture procedures. <u>U.S. v. Real Property Located at 3234 Washington Ave. North, Minneapolis, Minn</u>., 480 F.3d 841, 842-43 (8th Cir. 2007).

1.  <u>Burden of Proof</u>.

As recently explained by the Eighth Circuit:

> Under CAFRA, "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). When the government claims that property is subject to forfeiture because it "was used to commit or facilitate the commission of a criminal offense," as in this case, CAFRA provides that "the Government shall establish that there was a substantial connection

>    between the property and the offense." 18 U.S.C. §
>    983(c)(3). The term "facilitate" encompasses "activity
>    making the prohibited conduct less difficult or 'more
>    or less free from obstruction or hindrance.'" <u>United
>    States v. Premises Known as 3639-2nd St., N.E., Mpls</u>.,
>    Minn., 869 F.2d 1093, 1096 (8th Cir. 1989). If the
>    government satisfies this burden of proof, then the
>    claimant must prove an affirmative defense to
>    forfeiture, such as the "innocent owner defense"
>    codified in 18 U.S.C. § 983(d), or that the forfeiture
>    constitutes an excessive fine, see <u>United States v.
>    Dodge Caravan Grand SE/Sport Van</u>, 387 F.3d 758, 762-64
>    (8th Cir. 2004).

<u>Id.</u>

Accordingly, the court must evaluate the facts and determine whether, under the totality of credible evidence presented, the government has proved by a preponderance of the evidence that the $46,000 seized from Thompson's duffel bag on June 24, 2003 was used to commit or facilitate the commission of a drug trafficking crime. If the government meets its burden, Thompson and Zeppa have the burden of proving they have an ownership interest in all or a portion of the seized property, (<u>U.S. v. One Lincoln Navigator 1998</u>, 328 F.3d 1011, 1013 (8th Cir. 2003)), and that they are "innocent owners" as defined under 18 U.S.C. § 983(d)(2).[3] Claimants holding an ownership interest are deemed

---

[3] The claimants' answer lists certain allegations as "affirmative defenses." However, these allegations are statements claiming the traffic stop was illegal, that each claimant has an ownership interest in all or part of the $46,000, and that the money was not used to commit or facilitate the commission of a crime. No evidence was offered concerning the legality of the traffic stop. The remaining allegations of the answer are not true "affirmative defenses," but rather allegations to support claimants' Article III standing and refuting the allegations of the government's claim. Specifically, I do not construe the answer filed or the claimants' proposed findings of fact as raising an "innocent owner" affirmative defense.
   However, the pretrial conference order prepared by the

"innocent owners" upon proving they "(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. § 983(d)(2).

If the government meets its burden of proof, and neither Thompson nor Zeppa proves "innocent ownership," the entire $46,000 must be forfeited to the government. If either Thompson or Zeppa prove a 100% interest in the property and innocent ownership status, the entire amount must be returned to the innocent owner and the government's forfeiture complaint must be dismissed. If either Thompson or Zeppa is an innocent owner with respect to only a portion of the $46,000, the court must fashion a partial forfeiture remedy in accordance with 18 U.S.C. § 983(d)(5). <u>U.S. v. One Lincoln Navigator 1998</u>, 328 F.3d at 1013.

    2.   <u>Analysis of the Credible Evidence</u>.

When Eckerson and Thompson were questioned at the scene of the traffic stop concerning the origin, destination, and itinerary for their trip, their answers were not consistent. Eckerson stated he was laid off and heading to Las Vegas to gamble; Thompson said Eckerson was on a vacation from his employment and they were heading west, to California and possibly even Las Vegas. The traffic stop occurred only an hour's drive from Lincoln, Nebraska yet, at the time of the stop, Eckerson

---

parties raises an "innocent owner" defense. See filing 47, p. 2 at § C, ¶ 3. Therefore, to assure that all issues raised by the parties have been addressed and ruled on, I shall consider the claimants' innocent owner defense.

stated they may be staying overnight in Lincoln, Nebraska, while Thompson stated they were staying in Lincoln for up to three days with his niece, Linda.  Thompson couldn't identify Linda's last name or her address.  The fact that vehicle occupants provide conflicting stories concerning the details of their travel itinerary is suspicious conduct and warrants further investigation to determine if criminal activity is afoot.  U.S. v. Barragan, 379 F.3d 524, 529 (8th Cir. 2004).

It is undisputed that Thompson's duffel bag contained 19 bundles of cash totaling $46,000, and that each bundle contained several denominations of bills and was secured with a rubber band and not a bank wrapper.  Carrying a large amount of cash wrapped in rubber bands while traveling on the highway "is 'strong evidence' of a connection to drug activity."  U.S. v. $124,700 in U.S. Currency,  458 F.3d 822, 826 (8th Cir. 2006)(quoting $84,615 in U.S. Currency, 379 F.3d 496, 501-02 (8th Cir. 2004); U.S. v. U.S. Currency, in Amount of $150,660.00, 980 F.2d 1200, 1206 (8th Cir. 1992)(holding that if currency was from a bank, the money would have been wrapped in bank money wrappers and not rubber bands).  "A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a [duffel bag]. . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities."  U.S. v. $242,484.00, 389 F.3d 1149, 1161 (11th Cir. 2004).  "The same is not true of drug rings, which commonly do utilize couriers to transport in cash their ill gotten gains, which can be huge."  Id.

When asked if there were large amounts of currency in the vehicle, Thompson appeared nervous, his left eye twitched, and he

looked away from the officer while denying possession of large amounts of currency.  Later Thompson admitted to having $3000 to $4000, then $30,000 to $40,000, and finally $25,000 to $30,000.  Thompson initially lied about having money in the vehicle, and then provided vastly inconsistent statements concerning the amount of money he was carrying.  "[E]vidence concerning the claimants' allegedly "suspicious" and nervous behavior during the traffic stop can be considered in determining whether the government had probable cause to forfeit claimants' currency," (U.S. v. Ten Thousand Seven Hundred Dollars and No Cents in U.S. Currency, 258 F.3d 215, 226 (3d Cir. 2001)), and providing false statements to an officer about having money in a vehicle is "further reason to question the legitimacy of the currency's presence."  U.S. v. $124,700 in U.S. Currency, 458 F.3d at 826.  See also U.S. v. $84,615 in United States Currency, 379 F.3d at 502 (holding that claimant's attempts to conceal the money's presence by falsely stating he could not open the trunk, combined with packaging the money to mask drug odors, was evidence that the money was connected to drug trafficking).

     Finally, canine Mato, a reliable narcotics dog,  alerted and indicated the presence of the odor of illegal drugs on the 19 bundles on cash removed from the vehicle.  Later, Sergeant VanBuren checked to make sure Mato was not responding to the odor of currency alone by commanding Mato to conduct a canine sniff in a locker room where the 19 bundles were in one locker, and $300 withdrawn from a bank were in another locker.  Mato alerted and indicated to only the locker with the 19 bundles inside.  While a canine sniff alone may not sufficiently prove that currency is related to illegal drug activity, (Muhammed v. Drug Enforcement Agency, 92 F.3d 648, 653 (8th Cir. 1996)(holding that a dog alert is "virtually meaningless" because an "extremely high percentage

of all cash in circulation in America today is contaminated with drug residue"), under the totality of circumstances in this case, Mato's alert and indication to Thompson's currency supports a connection between the money and drug trafficking. <u>U.S. v. $117,920.00 in U.S. Currency</u>, 413 F.3d 826, 829 (8th Cir. 2005)(citing <u>$84,615 in United States Currency</u>, 379 F.3d at 502; <u>$141,770.00 in United States Currency</u>, 157 F.3d at 604; <u>U.S. Currency in the Amount of $150,660.00</u>, 980 F.2d 1200, 1206 (8th Cir.1992). See also <u>U.S. v. $22,474.00 in U.S. Currency</u>, 246 F.3d 1212, 1216 (9th Cir. 2001)(holding that evidence of a positive dog sniff is probative of the connection between the seized money and illicit drug trafficking where the evidence established that the dog would not alert to currency in general circulation).

Thompson and Zeppa claim, however, that of the $46,000 seized by the government, $18,000 was money received by Zeppa from the Social Security Administration to care for her children, and the remaining money was the operating capital for Thompson's automotive sales and repair business. Having observed the demeanor of the witnesses and considered their statements, I find that the testimony of Thompson and Zeppa regarding the source of the $46,000 seized by the government was not credible. Thompson's testimony purports to trace $28,000 of the funds to a business loan he received nearly two years before the traffic stop, and he offered no documentation to support this claim. Moreover, Thompson's testimony was internally inconsistent in at least two areas: 1)if Thompson truly believed cash hidden on his property was more secure and accessible than having a bank account, he would have withdrawn his loan proceeds from the credit union all at once rather than in increments over a three-week period; and 2) Thompson claimed that he routinely wrapped

his cash in $1000 bundles, but the $46,000 seized was wrapped in only 19 bundles.  Finally, Thompson's testimony that he hid all his money in such places as dresser drawers, car trunks, holes in the back yard, and under mattresses to make sure it was secure, and then grabbed all the money he could find, including Zeppa's, so he could gamble in Las Vegas, was simply incredible.

     I also conclude Zeppa's testimony was not credible.  Zeppa claims $18,000 of the $46,000 seized can be traced to Social Security payments she received as child support.  In her testimony, Zeppa described a close-knit household that conducted monthly family meetings, secured private schooling for the children, and needed the money received from the Social Security Administration to care for those children.  Yet rather than deposit and keep this money in a bank, Zeppa testified that after paying the loan for the private schooling, she chose to store all the remaining Social Security money as cash in an unlocked lock box behind the dresser in her home where Thompson, and anyone else who came to the home, could easily access the money.  According to Zeppa, Thompson allegedly took her money and left her a note in the lockbox.  However, the note was not offered in evidence, and Thompson never told Agent Sikorski or Deputy Degan that any portion of the cash seized was Zeppa's property.  Zeppa's claim that she owned $18,000 of the $46,000 was not raised until long after the government's forfeiture proceeding was filed.

     Based on the testimony of the witnesses, I conclude that Thompson and Zeppa jointly fabricated a story in an attempt to explain how Thompson came to possess $46,000 in cash on June 24, 2003, and they chose not to present documentation in support of their testimony for fear their story would quickly unravel.  In

contrast, the government has presented persuasive evidence that Thompson and Eckerson provided conflicting versions of their travel plans; Thompson would not maintain eye contact and his eye twitched when he denied having large amounts of currency in the vehicle; Thompson later changed his story and provided inconsistent statements about the amount of currency in his possession; the officers found 19 bundles of currency wrapped in rubber bands totaling $46,000 hidden in a duffel bag in the vehicle; and a reliable narcotics detection canine alerted and indicated to the scent of illegal drugs on the 19 bundles, but did not alert or indicate to the scent of currency withdrawn from a bank.

The Eighth circuit has "adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking." U.S. v. $124,700 in U.S. Currency, 458 F.3d at 826. Applying common sense to the totality of facts before me, I find the government has proved, by a preponderance of the evidence, that the $46,000 seized from the Lincoln Town Car on June 24, 2003 was used to commit or facilitate the commission of a drug trafficking crime, and a substantial connection exists between this seized currency and an illegal drug offense. See e.g. U.S. v. $124,700 in U.S. Currency, 458 F.3d at 826-27 (holding that a substantial connection existed between a drug trafficking offense and $124,700 found in vehicle during traffic stop, where the driver had flown on a one-way ticket and gave vague explanation as to why he elected to return in a car leased by someone who was not present, lied about having money in the vehicle, stated he carried cash for his business, the currency was concealed in aluminum foil inside cooler, and a canine alerted to currency);

U.S. v. $117,920.00, 413 F.3d at 829 (holding evidence established substantial connection between $117,920 in cash found in defendant's car and drug trafficking where the cash was bundled in rubber bands, enclosed in a plastic sack, and hidden beneath clothing in a duffle bag, defendant lied about not having a large amount of currency, the vehicle contained materials used to package drugs, a drug dog alerted to the currency, and bags in the car smelled of marijuana); U.S. v. $242,484.00, 389 F.3d 1149 (11th Cir. 2004)(holding the government was entitled to forfeiture of $242,484.00 of cash that was rubber-banded and wrapped in cellophane, and being transported from New York to Miami by an airline passenger who purchased her round-trip ticket with cash, changed her return flight, did not know source of the money and told conflicting stories about purpose of her trip, and provided no documentation evidencing the transfer of the cash to her, its origin, or its purpose, and an experienced and highly skilled narcotics dog alerted to the scent of drugs on the cash in her backpack but not to bags containing sham currency).

    To the extent that the claimants have raised an "innocent owner" defense, they have failed to prove this affirmative defense.  Zeppa's testimony was not credible, and she has failed to prove any ownership interest in all or even a portion of the $46,000 seized.  She has no standing to assert an innocent owner defense to forfeiture of any of the $46,000 seized, including the $18,000 she claims was taken by Thompson from her unlocked lockbox.  U.S. v. One Lincoln Navigator 1998, 328 F.3d at 1013.

    Moreover, neither Zeppa nor Thompson offered any credible evidence proving they were unaware that the money was used to commit drug-related crimes or that, upon learning that the money

18

was being so used, they did all that reasonably could be expected to terminate such use of the property.

Accordingly, the government is entitled to a judgment of forfeiture.

IT THEREFORE HEREBY IS ORDERED:

a.  The defendant currency, $46,000 in United States currency, shall be forfeited to the plaintiff, the United States of America.

b.  Judgment will be entered accordingly by separate document.

DATED this 7th day of May, 2007.

> BY THE COURT:
>
> s/ *David L. Piester*
> David L. Piester
> United States Magistrate Judge